**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **ESTELLA PAGE**, *et al.*, | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 89-2997 (JEB)** |
| **PENSION BENEFIT GUARANTY CORPORATION,** | |
| **Defendant.** | |
| **MARY COLLINS**, *et al.*, | |
| **Plaintiffs,** | |
| v. | **Civil Action No. 88-3406 (JEB)** |
| **PENSION BENEFIT GUARANTY CORPORATION,** | |
| **Defendant.** | |

## MEMORANDUM OPINION

There may be two things in life that are certain, but in class-action settlements, there is but one: attorney fees. The question now before the Court is whether those fees have properly come to an end after more than $85 million in payouts. The Pension Benefit Guaranty Corporation contends that they have because a settlement Wrap-Up Agreement unambiguously precludes fees after a ten-year period, which has now expired. Class Counsel, not surprisingly, disagree. The gist of their argument is that the PBGC failed to adequately process benefit payments during the fees period; as a result, Counsel assert that they have not yet received the

benefit of their bargain. Because the Court agrees with the PBGC and finds no reason to amend this restriction, it will deny Class Counsel's Motion seeking further fees.

## I.       Background

The two class-action lawsuits underlying this Motion are older than the majority of today's law-school students.  In the late 1980s, the cases were initially assigned to then-Chief Judge Aubrey Robinson and were then transferred to Judge Richard Roberts in March 2001, where they remained until his retirement in April 2016, at which point they was assigned to this Court.  In 1996, Class Counsel and the PBGC settled the consolidated cases, and in 2002 negotiated a Wrap-Up Agreement that should have put a final bow on that settlement's work. There has instead been more litigious infighting than administrative wrapping-up between the parties ever since.  Court delays, unfortunately, deserve blame as well.  Now, more than a decade later, the two sides remain at loggerheads over how to interpret their Agreement.  The instant Motion to enforce the Agreement's attorney-fees provision is just one manifestation of this long-running feud.

The Court must do a bit of heavy lifting to sort through the factual and procedural baggage behind this Motion.  The first section below thus briefly outlines the original Settlement Agreement and describes its implementation phase.  Next, the Court provides the basic terms of the Wrap-Up Agreement and sketches the parties' protracted dispute over the PBGC's alleged non-compliance with it.  A third section details the settlement benefits that have continued to be paid to the class members – with corresponding attorney fees to Counsel – in the midst of this entrenched dispute.  Finally, the Court outlines the key events that have occurred since the PBGC stopped subtracting attorney fees from the benefit payments in September 2012.

A.  <u>Settlement Agreement and Implementation</u>

In 1986 and 1988, two class-action lawsuits were filed against the PBGC over the termination of federally insured pension plans.  <u>See</u> <u>Page v. Pension Benefit Guar. Corp.</u>, 498 F. Supp. 2d 223, 224 (D.D.C. 2007).  After extended negotiations, Class Counsel and the PBGC entered into a Settlement Agreement in these suits in 1996.  <u>Id.</u>  Under its terms, the PBGC was to put money into a Settlement Fund, and a Settlement Director was tasked with locating, processing, and paying as many eligible class members as possible during a 36-month settlement-implementation period out of that Fund.  <u>Id.</u>  A Class Action Settlement Board (CASB), composed of two representatives from each side and a neutral lawyer, oversaw the Director's efforts.  <u>Id.</u>  At the time of the settlement, the PBGC represented to the Court that they anticipated settlement-benefit payments would reach $65-70 million.  <u>See</u> ECF No. 134-1 (Final Report), ¶ 10. (All ECF citations are to <u>Page</u>, 89-2997, rather than <u>Collins</u>, 88-3406.)

This estimate was more than a tad low.  After two extensions, the settlement-implementation phase finally came to an end in 2002 with the Settlement Fund having paid out over $922 million in benefits to class members.  <u>See</u> Final Report, ¶ 30.  The reason that amount substantially outpaced the original estimate of likely benefit payments was the "extremely diligent" efforts made by the CASB to locate missing class members, which "far exceed[ed] the requirements of the Settlement Agreement and . . . the efforts of many previous class actions." <u>Id.</u>, ¶ 33.  When these benefit payments were made, Class Counsel, in turn, received 8% of them as attorney fees under an order from this Court.  <u>See</u> ECF No. 133-8 (Order Approving Attorney Fees) at 3.  In other words, Class Counsel pocketed around $75 million in fees.

B.  Wrap-Up Agreement

In April 2001, the parties worked out a Wrap-Up Agreement to close out the settlement, which this Court later approved.  Page, 498 F. Supp. 2d at 224; see also ECF No. 133-5 (Wrap-Up Agreement).  The Agreement provided for the "shut down of the substantive work of the Settlement Director by August 31, 2002, and for the CASB to disband by December 31, 2002." Page, 498 F. Supp. 2d at 224.  Much of the Agreement laid out the mundane administrative tasks that the parties would need to complete to responsibly shutter the settlement's organizational apparatus – e.g., the storage of the CASB's records.  See Wrap-Up Agreement.  The Agreement, moreover, anticipated that the Court would then discharge the CASB, the parties, and the Settlement Director "from any and all obligations under the Settlement Agreement or otherwise arising from this litigation" by the end of 2002.  Id. at 11.

The Agreement also provided for the payment of class benefits to continue past this formal shutdown.  Because the Settlement Director had calculated benefits for some class members who had not yet been located, the PBGC committed to pay benefits to these members through its own Pension Search Program if they were later found.  See Wrap-Up Agreement at 1-2.  The Pension Search Program is a general-pension portal that the PBGC maintains to allow "individuals who are entitled to benefits from [any] pension plans that PBGC has taken over" to enter their name and retrieve results for benefits that are owed to them under those plans.  See Final Report at 9 n.1.  The beneficiary may then fill out forms to confirm her identity and claim her money.

The Agreement further offered incentives to Class Counsel and private address-search firms to continue to look for these remaining class members for periods of time after the transition to the Pension Search Program.  For three years, the PBGC agreed to pay 10% of

4

benefit payments to address-search firms when a class member claiming the settlement benefit

on Pension Search had been located by such a firm.  Id. at 15; Wrap-Up Agreement at 9.  The

Agreement also provided that corresponding attorney fees would continue to be deducted from

benefit payments under this new system as follows:

> The modification of PBGC's liability to pay settlement benefits to
> permit settlement benefit payments through PBGC's Pension
> Search program after August 31, 2002, instead of through the
> Settlement Benefits Fund, shall not modify the U.S. District
> Court's June 7, 1996 Order awarding attorneys' fees as a
> percentage of class counsel's recovery on behalf of the class.
> Attorneys' fees shall continue to be deducted when settlement
> benefit payments are made to class members at the 8% rate
> provided in the U.S. District Court's June 7, 1996 Order for a ten-
> year period.  Thereafter, PBGC shall have no further liability to
> class counsel in this case.

Wrap-Up Agreement at 8.

Needless to say, the wind-down did not go smoothly.  By the end of 2002, the PBGC had

begun paying settlement benefits through Pension Search, and the Settlement Director had

ceased its work.  Several of the administrative tasks necessary to shut down the CASB, however,

had not yet been completed.  See Page, 498 F. Supp. 2d at 226.  As a result, in their December

2002 Final Report, the parties asked that the Court "issue an order of discharge . . . following

completion of [several administrative] tasks . . . and conditioned on the filing of the CASB's

2001 and 2002 Financial Statements." ECF No. 134-1 (Joint Notice of Filing of Final Report and

Request for Order of Discharge) at 1-2.

These tasks were not subsequently completed, and no final discharge issued.  See Page,

498 F. Supp. 2d at 225.  The parties hotly contest who is to blame for this, but only one thing is

clear from the record: in May 2003, the CASB's wind-up efforts collapsed completely.  See ECF

No. 132-1 (Declaration of Stephen R. Bruce), ¶ 4; ECF No. 133-18 (Declaration of Patricia

Scott-Clayton), ¶ 11.  The PBGC then filed a motion to compel closeout of the settlement in June

2003, alleging that Class Counsel had stymied its efforts to resolve the remaining tasks.  See

Page, 498 F. Supp. 2d at 226.  Because the Wrap-Up Agreement required the CASB to disband

no later than December 31, 2002, the PBGC argued that the Court should adopt procedures to

complete the "undisputedly simple tasks, such as sending documents to storage," and then order

a discharge.  See ECF No. 67 (Motion for Settlement) at 2-3.

Class Counsel disagreed, claiming that the PBGC representatives – not Counsel – had

walked out on the CASB.  See ECF No. 71-2 (Memorandum in Support of Cross Motion) at 1.

According to their brief, the PBGC had done so to avoid an audit of the Pension Search Program.

Id. at 11-13.  Counsel thought this audit necessary because a final audit in 2002 had identified

some issues with the transition to the Program.  See ECF No. 133-17 (Final Operational Audit) at

2 (concluding "most of [the processing issues] seem to be startup issues for the PBGC in

transitioning from the Settlement Director").  These problems – as well as the remaining

administrative tasks – must be resolved by the CASB, Counsel argued, before the parties could

be discharged from their settlement obligations.  See ECF No. 71 (Cross Motion to Enforce

Settlement Agreement) at 1-3, 11-12.  It thus requested that the Court refer the parties' dispute

back to the CASB.  See id. at 1-3, 26.  The PBGC rejoined that the CASB had no authority

under the Agreement to supervise its Pension Search Program, and, accordingly, any payment-

processing issues that might arise must be brought by individual beneficiaries under the

Administrative Procedure Act, as provided for in the Wrap-Up Agreement.  See ECF No. 73

(Reply to Opposition) at 1.

A magistrate judge ultimately decided to refer the dispute back to the CASB for

resolution.  See ECF No. 76 (Feb. 25, 2005, Memorandum Order by Magistrate Judge Robinson)

at 2-3.  This decision was eventually affirmed by Judge Roberts in July 2007, who reasoned that

the "referral of the pending <u>administrative</u> issues to the [CASB was] appropriate because the

Agreement conditioned its dissolution on the completion of the remaining administrative tasks

and the parties did not dispute that those tasks had not been completed."  <u>Page</u>, 498 F. Supp. 2d

at 224-26 (emphasis added).  The PBGC immediately appealed, but held that appeal in abeyance

after the CASB resumed meeting in September 2007.  <u>See</u> D.C. Cir. Docket # 07-5333; ECF No.

86 (Joint Status Report on Referral) at 4.

Over the next six years, from 2007 to 2013, Class Counsel and the PBGC continued to try

to resolve their issues through the CASB with little to show for it.  In short, Class Counsel

continued to refuse to complete administrative closeout tasks until the PBGC agreed to an audit

of Pension Search or to fund a resumption of locator searches through a third party.  <u>See</u> ECF

No. 101 at 1-5.  Class Counsel further asserted that the time periods in the Agreement,

"including the provisions on attorney fees," must be extended "to account for the period between

May 6, 2003 and July 31, 2007 . . . during which PBGC refused to participate in the CASB."  <u>Id.</u>

at 5.  The PBGC, in turn, refused to submit to an audit or to pay for locator searches, which it

thought the CASB had no authority to order or supervise, unless Class Counsel released it from

the other settlement disputes and closed up shop.  <u>See</u> ECF No. 102 at 4-5. The two came close

to a compromise in 2010 that would have allowed the former Settlement Director to resume

class-member location services for a limited period in lieu of a Pension Search audit, but that

agreement never came to fruition.  <u>See, e.g.</u>, ECF No. 135-2.

C.  <u>2002-2012 Benefit Payments</u>

The PBGC continued, meanwhile, to pay settlement benefits to class members through

Pension Search despite this row with Class Counsel over the Wrap-Up Agreement.  In December

2002, at the close of the settlement-implementation phase, the parties represented that the "total outstanding liability for benefits determined by [the Settlement Director as of November 30, 2002,] is approximately $75 million."  Final Report, ¶ 36.  Of this amount, $55 million was due to class members for whom there were valid addresses and $20 million was due to class members for whom the Settlement Director had never been able to identify an address.  Id.  The parties thus expected that a "large portion" of this remaining liability would "likely [] be paid out over the next year or two as the individuals specifically listed under the Pension Search program are discovered by address search contractors or class counsel."  Id., ¶ 37.

This time their estimate proved not too far off.  In fact, over the next two years, from December 2002 through November 2004, the PBGC paid out almost $39 million in settlement benefits to an additional 3,172 class members under Pension Search.  See ECF No. 135-4 (Page-Collins Payments made by PBGC) at 2.  In the subsequent two-year period, from December 2004 through November 2006, it also paid out nearly $7 million to another 481 class members. Id. at 2-3.  All told, in fact, in the decade after the Wrap-Up Agreement transferred payment processing from the Settlement Director to the Pension Search Program, the PBGC paid out more than $111 million in benefits to almost 7,500 class members.  Id.  The PBGC, moreover, subtracted the 8% attorney fees required under the Wrap-Up Agreement for each payment.  To put this number in perspective, this meant that from the start of the settlement through 2010, the PGBC had paid more than 900,000 individuals – over 96% of the class – benefits totaling more than $1 billion, and Class Counsel had received over $85 million in corresponding attorney fees. See ECF No. 135-2 (Final Amendment to the Settlement Agreement) at 2.

At the start of September 2012, however, the well ran dry.  The PBGC stopped subtracting attorney fees from the benefits that it paid out to newly located class members that

month.  <u>See</u> ECF No. 133-12 (Email from Thompson to Menke) at 1.  The benefits payments

themselves also slowed to a trickle, and in some months no benefit payments were made at all.

<u>See</u> Page-Collins Payments at 4-5.

D.  <u>Post-2012 Events</u>

Six months later, the parties finally made some headway in their dispute.  In a May 2013

court-ordered mediation, the PBGC agreed to provide an additional $250,000 to Class Counsel to

locate remaining class members in exchange for the transfer of $4 million back to the PBGC in

leftover Settlement Funds.  <u>See</u> ECF No. 114 (Joint Status Report on Mar. 20, 2014), ¶ 7.  With

this money, Class Counsel employed the previous Settlement Director, who turned over "contact

information for 380 [previously unlocated class members] due benefits totaling over $12

million."  <u>Id.</u>, ¶ 2.  Settlement-benefit payments, accordingly, began to rise through the summer

of 2014 as the PBGC processed payments for these members.  <u>See</u> Page-Collins Payment at 5.

From March 2014 through February 2016, for example, the PBGC paid out a little more than $12

million in additional benefits to 441 class members.  <u>Id.</u>  In the next six months, it paid out nearly

$4.6 million more to another 379 members.  <u>Id.</u>

Class Counsel also began asking the PBGC to resume withholding the attorney fees in

anticipation of this uptick in benefit payments.  <u>See, e.g.</u>, ECF No. 108, ¶ 9.  Although such

request would on its face appear to violate the ten-year limit on fees set forth in the Wrap-Up

Agreement, Class Counsel nevertheless argued in a September 2013 email that they were entitled

to these fees because the PBGC had not participated in the CASB meetings for five of the first

ten years covered by that attorney-fee provision.  <u>See</u> Email from Thompson to Menke at 1.

Class Counsel thus asserted that they had not received "the benefit of the bargain negotiated in

the Wrap-Up Agreement" during those years because the "PBGC [could not lawfully] take

advantage of [the] ten-year period for deducting attorneys' fees when PBGC ha[d] taken actions

that prevented settlement benefits from being paid during that period." Id. (citing contract

treatises). The PBGC responded that it could not resume withdrawing attorney fees from

settlement payments since the Agreement's unambiguous ten-year term for such fees had

expired. See ECF No. 108 (9/5/13 Status Report of PBGC), ¶ 9.

On December 4, 2013, Class Counsel attempted to assert a charging lien for these

attorney fees on any subsequent settlement-benefit payments. See ECF No. 133-20 (Notice of

Attorney Lien on Distributions). The PBGC, however, continued to maintain that it could not

take the money from the settlement beneficiaries without a modification of the Agreement. See

ECF No. 113 (12/19/2013 Joint Status Report), ¶¶ 29-31. The two went back and forth until, on

May 19, 2014, Class Counsel filed a Notice of Attorney Charging Lien with this Court, asserting

a lien against all of the PBGC's assets. See ECF No. 115. Although the PBGC moved to strike

shortly thereafter, the Court issued no ruling. Almost two years later, once the cases were re-

assigned to this Court, it denied the motion to strike without prejudice so as to allow the parties a

chance to resolve their remaining disputes through the CASB. See 4/18/2016 Minute Order;

ECF No. 128 (Order for Referral to CASB).

Class Counsel and the PBGC were unable to come to terms on the attorney-fees dispute

at the CASB, and, on July 7, 2016, Class Counsel filed this Motion to Enforce the Court-Ordered

Wrap Up Agreement and Charging Lien. See ECF No. 132 (Motion to Enforce). That Motion is

now ripe.

## II.    Legal Standard

The claims of a federally "certified class may be settled, voluntarily dismissed, or

compromised only with the court's approval." Fed. R. Civ. P. 23(e). In approving a class-action

settlement, a federal court may retain jurisdiction over the implementation of the parties'

agreement and incorporate its terms into a judicial order.  Kokkonen v. Guardian Life Ins. Co. of

America, 511 U.S. 375, 380-81 (1994).  The agreement is then treated as a consent decree.

United States v. Alshabkhoun, 277 F.3d 930, 934 (7th Cir. 2002) (defining consent decree as "a

court order that embodies the terms agreed upon by the parties as a compromise to litigation").

 A consent decree is interpreted according to the "ordinary principles of contract law."

United States v. W. Elec. Co., 894 F.2d 430, 434 (D.C. Cir. 1990); Omega Eng'g, Inc. v. Omega,

S.A., 432 F.3d 437, 443 (2d Cir. 2005) (recognizing a "settlement agreement is a contract that is

interpreted according to [the] general principles of contract law").  The decree's meaning "must

be discerned within its four corners."  W. Elec., 894 F.2d at 434 (quoting United States v.

Armour & Co., 402 U.S. 673, 682 (1971)).  In other words, the "interpretation of a

decree must be grounded in the text of the agreement and contemporaneous understandings of its

purposes, not in [the court's] conception of wise policy."  Id. (quotation marks omitted).

 A district court may also modify a consent decree that it administers.  Id.  A modification

"adjust[s] the obligations of the parties in response to unforeseen changes in circumstances, or in

response to anticipated changes expressly identified by the parties upon entering the decree."  Id.

(internal citation omitted).  A court may not, however, "take action that purports only to interpret

a decree but that in fact modifies it without adjudication."  Id. (citing United States v. ITT Cont'l

Baking Co., 420 U.S. 223, 236 n. 9 (1975)).

 In their briefs analyzing the contract issues set forth below, the parties do not contend that

the law of any particular jurisdiction applies.  As the Court's analysis similarly does not require

such a determination, it need not answer this question.  See Western Elec., 894 F.2d at 434 (not

specifying source of contract law in interpreting consent decree).

**III.    Analysis**

The crux of Class Counsel's current Motion is simple: does the Wrap-Up Agreement's

ten-year limit on attorney fees bar further recovery here?  As a reminder, the clause at issue

states:

> The modification of PBGC's liability to pay settlement benefits to
> permit settlement benefit payments through PBGC's Pension
> Search program after August 31, 2002, instead of through the
> Settlement Benefits Fund, shall not modify the U.S. District
> Court's June 7, 1996 Order awarding attorneys' fees as a
> percentage of class counsel's recovery on behalf of the class.
> Attorneys' fees shall continue to be deducted when settlement
> benefit payments are made to class members at the 8% rate
> provided in the U.S. District Court's June 7, 1996 Order for a ten-
> year period.  Thereafter, PBGC shall have no further liability to
> class counsel in this case.

Wrap-Up Agreement at 8 (emphasis added).

It bears noting at the outset that Class Counsel do not ask this Court to modify the terms

of the Agreement.  They instead assert that the Agreement's attorney-fees provision should be

interpreted in a manner that assures they receive the full "benefit of the bargain."  See Mot. at 2-

3.  In particular, Counsel contend that they consented to limit the 8% fee award to benefits "paid

in a ten-year period after August 31, 2002, in exchange for [the] PBGC's promises to pay those

settlement benefits in accordance with the standards the Settlement Director applied, and also

with the assistance of a locator program to locate participants."  Id. at 2 (quotation marks

omitted).  The PBGC, according to Counsel, has not fulfilled its part of that deal.  Id. at 3.  In

Counsel's view, this Court should thus read the ten-year term in the attorney-fees provision to

extend past a straight ten-year calendar period to compensate for the PBGC's failure to fully

comply with the Agreement's payment-processing terms during that timeframe.  Id.

As the PBGC points out, the fundamental problem with Class Counsel's position is that it

runs counter to the "plain and unambiguous" terms of the contract.  See, e.g., Travelers Indem.

Co. v. Bailey, 557 U.S. 137, 150-51 (2009) (recognizing it is "black-letter law that the terms of

an unambiguous private contract must be enforced irrespective of the parties' subjective intent,

[and] it is all the clearer that a court should enforce a court order . . . according to its

unambiguous terms") (internal citation omitted).  As explained above, the Agreement's attorney-

fee provision provides that, "after the August 31, 2002," transition to Pension Search,

"[a]ttorneys' fees shall continue to be deducted when settlement benefit payments are made to

class members . . . for a ten-year period."  Wrap-Up Agreement at 8 (emphasis added).  The

Agreement next underscores this point: "Thereafter, PBGC shall have no further liability to class

counsel in this case."  Id.  These sentences do not make the running of the ten-year period

contingent on any other term in the Agreement.  No language, moreover, suggests that the fees

might extend past a ten-year calendar period if certain circumstances obtain.  Quite the contrary,

the provision conditions the period to start on August 31, 2002, and to extend for ten years

thereafter.

In seeking to circumvent this plain reading, Class Counsel advance three main arguments.

The sections below take up and reject each of them in turn.

A.  Contract Ambiguity

Class Counsel first assert that, despite its superficial clarity, the provision is ambiguous

about when the ten-year period should run.  In essence, Counsel maintain that this ambiguity

arises from the lack of a date in the sentence providing that the fees will run for "a ten-year

period." Reply at 5. They seek further support from the same sentence's use of "a" ten-year period, rather than "the" ten-year period. Id. This argument is specious. To qualify as ambiguous, the contract term must be "reasonably susceptible of different constructions and capable of being understood in more than one sense." Great Am. Ins. Co. v. Norwin Sch. Dist., 544 F.3d 229, 243 (3d Cir. 2008). Here, the directly preceding sentence supplies the relevant start date for the ten-year period: August 31, 2002. The lack of a date in the next sentence clearly avoids unnecessary repetition. Likewise, the use of "a" in that sentence is simply consistent with its resulting grammatical structure. The plain and ordinary meaning of this attorney-fee provision consequently forecloses the interpretation urged by Counsel.

B. Contractual Purpose

Class Counsel next argue that their interpretation of the fee provision would better fulfill the Agreement's over-arching purpose to encourage Counsel to locate additional class members. While this may be so, the asserted purposes of a consent decree cannot justify an interpretation that its "language cannot support." Hughes v. United States, 342 U.S. 353, 356 (1952) (rejecting such an invitation). In urging the Court down this path, Counsel point only to cases construing ambiguous contract terms. See, e.g., 3E Mobile, LLC v. Global Cellular, Inc., 121 F. Supp. 3d 106, 110-111 (D.D.C. 2015) (holding company's reading of "ambiguous" contract term was "untenable"). These cases stand for the general (and undebatable) principle that a vague contract term should be read in conjunction with the purposes of the contract in which it is found. Id. As already explained, however, the fee provision in the Wrap-Up Agreement is not ambiguous. This argument thus finds no traction.

14

C. Prevention

Counsel's final argument is that the ten-year limit in the attorney-fee provision should be extended because the PBGC prevented the settlement benefits – and thus the resulting fees – from being paid for some time during that period.  At first blush, this argument has more legal merit than the first two.  Indeed, it is hornbook law that "when a promisor wrongfully prevents a condition from occurring that condition is excused."  Shear v. Nat'l Rifle Ass'n of Am., 606 F.2d 1251, 1255 (D.C. Cir. 1979); see also Gulf Oil Corp. v. Am. La. Pipe Line Co., 282 F.2d 401, 404 (6th Cir. 1960) ("Where liability under a contract depends upon a condition precedent one cannot avoid his liability by making the performance of the condition precedent impossible, or by preventing it.").

This contract principle, however, is hardly a perfect fit for the contract at issue here.  The doctrine of prevention is typically applied to conditional contracts – for example, in the context of suits brought by real-estate brokers seeking to compel the payment of a commission when the buyer has acted to prevent the sale of a property.  See, e.g., Shear, 606 F.2d at 1253-55.  To state the obvious, the Wrap-Up Agreement is not a conditional contract.  The PBGC is obligated to perform under the Agreement irrespective of any condition precedent.  Defendant, moreover, is not seeking to escape from its liability to perform under the terms of the contract by claiming, for example, that it no longer needs to process benefit payments.  Instead, the only issue in this Motion is whether, when the PBGC makes such payments, it must still reserve 8% of those benefits for attorney fees.  Class Counsel cite no cases that have applied the doctrine of prevention to excuse a time period in even a related situation.  See Mot. at 8 (citing to cases applying equitable estoppel and other unrelated legal doctrines to factually distinct situations).

Setting this deficiency aside, Counsel's argument suffers from another fatal flaw.  The record does not show that the PBGC actually <u>prevented</u> the payment of settlement benefits during the relevant time period.  Counsel first point to Defendant's failure to participate in the CASB meetings for a period of five years from 2002-2007.  The record, however, does not place sole blame for the CASB's meltdown at the feet of the PBGC.  Nor does it indicate that the PBGC failed to make payments to class members during this time period.  As explained above, the evidence demonstrates quite the opposite.  From September 2002 through August 2012, the PBGC made $111 million in benefit payments to an additional 7,500 class members.  <u>See</u> Page-Collins Payments at 2-3.  This sum is not only substantial, but roughly accords with the parties' joint representations in 2002 about the likely benefits payments that the PBGC would make during this period.  <u>See</u> Final Report, ¶¶ 36-37.  The PBGC also made the vast majority of these payments prior to the resumption of the CASB meetings in 2007.  The record, therefore, hardly supports the claim that the PBGC prevented the payments of settlement benefits by refusing to attend the CASB meetings.

Counsel nevertheless claim that the PBGC did prevent these payments because its failure to attend the CASB meetings avoided a follow-up audit of Pension Search.  This audit was necessary, according to Counsel, to correct the payment issues identified in the final 2002 audit.  The final closeout audit did, of course, identify some transitional issues at Pension Search in processing settlement payments under the terms of the Agreement.  <u>See</u> Final Operational Audit at 2.  But that closeout audit also expressly indicated that most of the problems it identified were predictable run-of-the-mill issues arising from the transition to a novel payment system.  <u>Id.</u>  Counsel, moreover, provide no evidence that the delays with processing the particular payments noted in that audit festered for the entire decade during which the PBGC made deductions for

attorney fees.  Indeed, Class Counsel never substantiate a single example of a legitimate class

benefit that was not processed and paid by the PBGC by the end of that decade.

     These transitional issues also fail to support the conclusion that Counsel have been

denied the "benefit of the bargain" for yet another reason.  Class Counsel and the PBGC

explicitly anticipated that some payment-processing issues would arise after the transition to

Pension Search when they cut the deal embodied in the Agreement.  The contract, in fact,

provides for a means to address these inevitable problems by allowing for the filing of APA suits

to enforce its payment-processing terms.  See Wrap-Up Agreement at 10 ("After settlement

obligations are transferred to Pension Search, there shall be a limited right of appeal to correct

the payee and to enforce this agreement and the statutory protections against arbitrary agency

actions under the Administrative Procedures Act, 5 U.S.C § 706.").  Given the clear

contemplation of this inevitability, this Court cannot retrospectively alter the allocation of risk

found in the Agreement now.  On the contrary, Counsel's failure to identify even one example of

an APA action brought against the PBGC seems to further indicate that the processing issues

identified in the final audit were neither widespread nor particularly egregious.

     In a final salvo, Class Counsel fall back on a series of unconvincing arguments about

inferences that might be drawn from various fluctuations in the benefit payments since 2002.

They first point to the steadily decreasing payments made by the PBGC from 2002-2012.  This

decline in payments, however, is consistent with Defendant's full compliance with the

Agreement.  As described above, the parties initially extended the settlement implementation

phase from three to six years to hunt down more class members.  By the time this phase ended,

the Settlement Director had engaged in "extremely diligent" efforts to locate every class

member.  See Final Report, ¶ 33.  The Director's work led, in fact, to benefit payments in excess

of ten times the amount of an early estimate presented to the Court.  Id. at 18.  The fact that

benefit payments subsequently decreased and later became sporadic is to be expected.  The

Director, after all, had already located the members who were easiest to find.  After the

Agreement went into effect, moreover, no entity was guaranteed up-front compensation for

working to track down the more elusive members.  Address-search firms were only compensated

when their efforts successfully located a class member during the first three years, and,

accordingly, the PBGC paid out over $200,000 to firms in that timeframe.  See ECF No. 133-1

(Declaration of Joseph Shelton), ¶ 20.  After that, under the plain terms of the Agreement, only

Class Counsel had a back-end incentive to locate further class members.  It is reasonable to

expect, then, that the monthly payments would eventually reduce to zero unless Counsel thought

that investing its own funds in locator efforts would pay dividends.  But that result is, again,

implicitly anticipated by – not contrary to – the terms of the bargain that they struck with the

PBGC in the Agreement.

     Common sense likewise undercuts Class Counsel's attempt to rely on the sudden increase

in benefit payments after the Director resumed its location efforts in 2013.  This uptick in

payments has a more obvious cause than the PBGC's prevention of payments from 2002-2012;

such increase occurred because the PBGC agreed to provide up-front funding for renewed

address-search efforts.  The PBGC, however, had no obligation to provide this money under the

plain terms of the Agreement.  It serves to reason, moreover, that payments to class members

would increase once such a dedicated effort was again underway.  The fact that payments

increased thus says nothing about whether the PBGC was complying with the Agreement's

payment-processing terms from 2002-2012.  Class Counsel undoubtedly would have preferred

that more class members showed up during the time when it was due a cut of the benefit

payments, but, under the terms of the Agreement, the onus was on <u>them</u> to make that happen, not the PBGC.

In the end, as the PBGC argues, Counsel are essentially seeking to modify the terms of the Agreement. At no point do they settle on a specific period during which the PBGC was allegedly not in compliance with the Agreement's payment-processing terms. Sometimes Counsel appear to claim the Court should discount periods that coincide with the five years where the CASB was not meeting. <u>See</u> Mot. at 2-3. At other times, they point to 28 sporadic months after September 2002 where no benefit payment was made – *i.e.* the months where Class Counsel did not receive any attorney fees. <u>See</u> Bruce Decl., ¶ 4. At still other points, they assert that the PBGC did not comply with the payment-processing terms until the August 2013 deal to pay $250,000 upfront for renewed address searches. <u>See</u> Mot. at 5. Conspicuously absent from Counsel's brief, however, is any method or measure of discounting the attorney fees that they received over the decade in which the PBGC undisputedly paid those fees. Extending the period could yield a windfall, resulting in Counsel's receiving <u>more than</u> the decade they bargained for in attorney fees under the Agreement. In essence, then, Counsel hope this Court will read the ten-year period in the Agreement to extend without limit to some unknown point in the future. This Court has neither the power nor desire to sanction such an extension.

**IV.     Conclusion**

As the period established for the payment of attorney fees under the Agreement has
expired and Class Counsel have shown no grounds upon which this Court could excuse that
condition, the Court will issue a contemporaneous Order denying their Motion to Enforce.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  October 3, 2016